NelsoN, J.,
delivered the opinion of the Court.
Three indictments appear to have been found against the plaintiff in error and one Thomas McBride, for the murder, in the first degree, of James Sparkman; two at the September Term, 1869, and the other at October Term, 1870, of the Circuit Court of White county; and it does not appear, either from .the bill of exception, or any other part of the record, upon which of the indictments the defendant was tried. His trial occurred at October Term, 1870, when he was found guilty of voluntary manslaughter, sentenced to five years’ imprisonment in the Penitentiary, and appealed to this Court. At the September Term, 1869, the plaintiff in error was admitted to bail on the first indictment; and the case was declared not bailable as to his co-defendant, McBride, *93 wbo was committed to prison. At the same term, permission was granted tbe Attorney General to re-commit the indictment to the grand jury; but whether it was actually sent back to said jury, or again returned into court, does not appear with certainty, though it may be inferred that a new indictment was sent, as the first indictment does not purport to have been made under oath, and is signed “A. F. Capps, Att’y Gen. P. T.,” while the second indictment purports to have been made on oath, and purports to be signed “A. F. Capps, Attorney General, pro tern.” The first shows the names of the prosecutor and witnesses, and shows also the finding of the grand jury. The second contains no indorse-ments whatever, and does not even show the finding of the grand jury that it was a true bill, and can not, properly, be regarded as an indictment. At the May Term, 1870, the defendants were arraigned and charged upon “the indictment,” and pleaded not guilty. The plaintiff in error entered a motion, supported by affidavit, “for a severance of their trial,” which, together with the cause, was continued, McBride being remanded to jail, and the plaintiff in error recognized. At the October Term, 1870, it appears that after the selection of the grand jury, two jurors were substituted in the place of two others, to act as grand jurors “in considering a bill of indictment preferred against Thomas McBride and Lot Anderson;” and a bill of indictment entitled of the October Term, 1870, with all proper indorsements thereon, was returned into court against Thomas McBride and the plaintiff in error for the same homicide, signed “Geo. H. Morgan, Attorney General 5th Circuit.” No action *94 appears to have been taken on the motion to sever, nor does any new motion appear to have been made upon the new indictment. The record then contains the following entry:
“State of Tennessee I v. V “Lot S. ÁNDersoN. J

Indictment for Murder.

“Came the Attorney General, who prosecutes for the State, and the defendant in proper person; and the defendant being arraigned and charged on the indictment, says he is not guilty, and for his trial puts himself upon the country; and the Attorney General doth the like. Then came a jury of good and lawful men,” &c., who were elected, tried and sworn, the truth to speak on the issue joined, &c., and were respited from rendering their verdict, from day to day, till Monday morning; upon which day the record states that they, “upon their oaths, do say the defendant is guilty of voluntary manslaughter: and that he be, therefore, imprisoned in the State Penitentiary for five years; whereupon came the defendant by his attorney, and moved the Court for a new trial, and also for arrest of judgment; which motion was continued for further action of the Court.”
The transcript of record does not show, as it should, the different days and dates of the meetings and adjournments of the court during the progress of the trial; but the record shows that the motion was overruled, and that the defendant excepted and appealed; and it may be inferred that this action was had on a day of the term subsequent to the day of the motion. Nor does the record show that A. F. Capps, whose name is signed *95 as Attorney General pro tem., was appointed as such under the Code, 3962, or under section 319.
It is impossible, from this transcript of the record, to determine whether the plaintiff in error was tried upon all or either of the indictments contained in it. The record does not contain any designation of the indictment by numbers, or any other evidence to enable us to discriminate between the indictments. It contains no indictment against the plaintiff in error alone, and does not show whether his motion for a severance was acted upon, or what disposition, if any, was made of the cause as to his co-defendant. Ordinarily, where there is an indictment against two, and one of the defendants is put upon his trial alone, it may be presumed that the other defendant was not arrested, or that a severance was permitted' by order of the Court. This presumption may well apply where there is but one indictment or presentment contained in the record, but can not attach where there is so much uncertainty as in this case. Nor do we perceive how the defect could be remedied by any statement or certificate from the Clerk, as such statement would be no part of the record itself. It may be that there are two separate files of papers in the court, and that two or more indictments are copied upon the minutes; but how could such a state of facts determine on which indictment the plaintiff in error was actually tried? It is a familiar principle that if, in a criminal case, the evidence shows, conclusively, that one of two persons committed an offense, but leaves it uncertain which of them is actually guilty, neither can be convicted. And how can it be said, in view of the constitutional pro *96 vision, that “no free man shall be put to answer any criminal charge, but by presentment, indictment or impeachment,” that the plaintiff in error has been tried upon an indictment, when the record shows that there are more indictments against him than one, but does not show upon which of them he was arraigned and tried? We do not hold that it would be impossible for the plaintiff in error, if the judgment against him were affirmed, to plead his conviction in this case in bar of another indictment; for the plea is of a mixed nature, partly of matter of record, and partly of matter of fact; the first relating to the indictment, and the second being the averment of the identity of the offense, and of the person as having been formerly indicted. See 1 Wat. Arch. Cr. Pl., 369, 370. Nor do we declare that it could not, in a proper case, be shown by parol evidence, in the Circuit Court, upon which of two or more indictments for the same offense, the party was actually tried; but such evidence can not be heard or supplied in this appellate tribunal, and in a case situated like this. The liberty of the citizen is of such inestimable value that he can not be deprived of it by judicial proceedings, except according to the strictest forms of law. These forms were established, in the struggle of centuries, to protect the citizen against the prerogatives of the king; and being well known and understood, alike in England and in our own country, as effective checks upon arbitrary power, it is to be regretted that they have not been more sacredly cherished.
As appearing, however, in the transcript, the question is one of substance, and not of' form, and extends to the *97 foundation of the conviction itself. There are objections to two of the indictments, which do not exist as to the third; but it is not necessary to specify them.
We would willingly forego the labor of further investigation and remand the cause alone upon the error indicated, but feel that our whole duty will not be discharged without the consideration of other propositions urged in argument.
So far as the facts are disclosed in the record, but two witnesses were examined who were actually present at the homicide. One of them, John E. Witt, was assailed upon the trial and shown, by various witnesses, to be unworthy of credit on oath, in consequence of his general bad character. Other witnesses, who were related to him, or otherwise prejudiced in the cause, sustained his credit, and, upon this state of proof, such a doubt is thrown upon his testimony, that, while we do not hold he is utterly unworthy of credit, we do not feel called to analyze his statements, although we will advert to some of them, or to state how far he is corroborated, and leave the question of his credibility to be determined by the jury, under proper instructions from the Circuit Court. For the purposes of this opinion, the facts of the case may be stated upon the evidence of Levi W. Wood, the other witness, whose credibility is fully sustained. His statement is as follows: “Thomas McBride and James Sparkman were playing cards for a pistol. McBride said he was seven, Sparkman said they were six and six. Then Sparkman got up and started off, and said McBride would not play a fair game; McBride said he would play a fair game; Sparkman *98 started to his house; McBride took up his pistol and cocked it and pointed it towards him and told him to come back; Sparkman said he would not; McBride said he would make him. Mr. Sparkman came back and took McBride by the bosom of his shirt and by the arm. Mr. McBride called for Lot and said, come here, Lot. The pistol went towards Lot, who picked it up and stood a little while, with the pistol in both hands, and then shot him. The parties had some liquor that day; Sparkman was not drunk; Lot S. Anderson had been drinking, but was not drunk.”
Other witnesses prove that although the plaintiff in error is neither an idiot nor a lunatic, he is a youth, sixteen or seventeen years of age, and of dull and feeble intellect. It is also shown, that he was intoxicated at the time of the homicide.
The statements of Wood and Witt, the impeached witnesses, are similar as to the leading facts, but both are singularly defective in not detailing the particular circumstances which attended the direct act of shooting; how far the parties were from each other; whether they were standing or sitting; or were directly face to face; the particular manner in which the pistol was held; whether it was aimed or pointed at the deceased; whether the plaintiff in error held both hands near his person, or extended them so as to indicate a deliberate, or momentary, purpose to fire; and other particulars which might elucidate the transaction and show whether the homicide was accidental or intentional, are not stated. Witness says, after McBride presented the pistol and ordered Spark-man to come back, “Sparkman then came right back *99 and caught McBride by the breast of the coat and knocked, or jerked the pistol out of his hand, and threw or knocked it on the ground; McBride caught him by the collar of the coat; Sparkman pushed McBride back on a still tub, when McBride said, I have nothing against you; Sparkman said, I have nothing against you; McBride said, come here Lot and get my pistol and help me. Lot picked up the pistol and shot Sparkman in the right shoulder. Then Sparkman walked around one or two still tubs to where I was and said, John, I am shot, <fec. The witness says, that at first, he paid no .attention to Sparkman, “for I thought he was not hurt much, on account of the way he was standing and the way he was shot,” but does not describe how he was standing or “the way he was shot.” He says further, that “when the pistol fell out of McBride’s hand, it fell towards where Lot Anderson was.” Both witnesses state that the pistol was cocked when McBride presented it at Sparkman and ordered him back, and there is no proof that its condition was changed when it was picked up by the plaintiff in error. It does not appear that there was any previous unkind feeling between the plaintiff in error and the deceased, or one word of altercation before the fatal result. If the plaintiff in error shot the deceased by design and at the command of McBride, the verdict of the jury was merciful. If he shot without intention, without aim, without the concurrence of his own will, and by accident, either in picking up the pistol, or in attempting to let down the hammer, he was guilty of no offense. If he really committed a crime, no motive is shown for its commission, *100 unless the statement of Witt' is to be credited, and it shall be inferred from that statement that his object was to aid his friend. Yet it is difficult to determine what the true motive was, if indeed there were any motive, where it seems that McBride and Sparkman had mutually stated that they had nothing against each other, and the record does not show whether it was before or after this apparent reconciliation that McBride called upon Lot, the plaintiff in error, to get the pistol and help him.
Upon the facts detailed in the record, we are not satisfied, beyond a reasonable doubt, that the verdict of the jury is correct; and as it is manifest that a fuller examination of the circumstances attending the homicide will shed light upon the whole transaction, and establish more satisfactorily the guilt or innocence of the plaintiff in error, it is due alike to the public and to him that a re-investigation shall take place. This is the more necessary, as the charge of his Honor may, in some respects, have misled the jury. It is to be regretted that the practice has so long prevailed in this State of sending indictments for murder in the first degree in all cases of homicide. There are many cases in which it is manifest that the offense, when tried, will amount to nothing more than manslaughter, or murder in the second degree; and there is no reason, under our statutes, why the indictment may not approach nearer to the facts of the case and be sent for murder in the second degree, or for manslaughter. When the bill is found for murder in the first degree, the case, prima fade, is not bailable, and much trouble and expense are often incurred in making a preliminary inquiry as to *101 whether the accused shall be admitted to bail; and such investigations, being public, often make it difficult to select juries in the counties where they occur. Another difficulty is, that, as the indictment embraces murder in the first and second degrees, and voluntary as well as involuntary manslaughter, much time is uselessly consumed ¡'in such investigations; and the charge of the court, instead of applying the principles of law to the particular facts in evidence, seems, necessarily, to involve a disquisition upon the entire law of homicide, so complicated and difficult that the jury may well be misled by the mere accumulation of abstract propositions, although there may be no special error in the charge itself. In this case, the legal propositions so elaborately submitted by his Honor to the jury, are generally correct, but they are stated in a manner so remote from the facts, that it is not, by any means, certain that persons unskilled in the law would. know how to apply them. While the Judge is not permitted to do more than state the facts and declare the law, he may well so apply the law to the facts in evidence as greatly to facilitate the investigation. ,
Among other things, his Honor instructed the jury that, “if a party use a deadly weapon and kill, he is presumed to have intended to have taken life.” As an abstract proposition, this may be correct, but as the question before the jury was whether the plaintiff in-error used the pistol at all; that is, as the question was whether it went off accidentally or by design in his hands, the statement, without qualification, was calcula *102 ted to mislead, as the jury might naturally infer that any use or handling of a pistol where death resulted, was unlawful.
After defining voluntary and involuntary manslaughter, and pointing out the difference between the latter and homicide by misadventure, his Honor proceeded to observe, that, “in general, where an involuntary killing happens in consequence of an unlawful act, it will be either murder or manslaughter, according to the nature of the act which occasioned it. If it be in the prosecution of a felonious intent, or in its consequences naturally tended to bloodshed, it will be murder; but if [noj more was intended than a mere civil trespass, it is manslaughter.”
In view of the facts, the jury should have been told distinctly, that the mere act of picking up the pistol was not in itself, unlawful; that if it was picked up for the purpose of preventing its unlawful use by either of the parties, the act was not unlawful; but that, if it was picked up for the purpose of taking part in their conflict, or of aiding or intimidating either, then the act was unlawful. 'The language of his Honor is obscure, and may have been understood by the jury as meaning, that, if the act of picking up, or holding, or handling the pistol, “in its consequences led to bloodshed,” the plaintiff in error would be guilty either of murder or manslaughter. And yet the plaintiff in error may have handled the pistol in such a manner that led to bloodshed, and he may have been entirely innocent; as, for example, if he was attempting to 'let down the cock or *103 hammer of the pistol to prevent bloodshed, and it was discharged by accident or awkwardness and contrary to his intention.
Without quoting his Honor’s charge, it may be observed that he instructed the jury as to what would be the law on various hypotheses mentioned by him predicated of the idea that the pistol was presented at Sparkman by the plaintiff in error, when there is no proof in the record to show that it was presented at all or for any purpose whatever. The charge as made, was calculated, though not intended, to create the impression on the mind of the jury that, in the opinion of the Court, there was proof to show that the pistol Avas actually presented; and the consequences of such a belief are too obvious to require comment. The deceased may have been shot by accident and without presenting the pistol; and it should have been clearly left to the jury to determine, from the proof, how the fact Avas.
Among other things, his Ho'nor was requested in behalf of plaintiff in error, to instruct the jury that “the absence of all evidence of an inducing cause is reasonably regarded, where the fact is doubtful, as affording a strong presumption of innocence.” In answer, his Honor stated: “The above is good laAL in a case of doubt, and I will add, that it is laid down in the same book, that Avhen the moral spring of action is once put in motion, then even a gesture or look may be the source of encouragement and impulse to the deadliest crimes, and subject the moral action even to the highest legal penalty. In other words, when a party is moved to the perpetration of an action, a very slight cause, a Avord, a gesture, may *104 urge the party to the commission of the most deadly action.” It is not easy to conjecture to what part of the case these abstract propositions were applicable; but they may well have been construed by the jury as applying to that part of the case in which the plaintiff in error was called upon by McBride to help him, and as indicating a strong opinion of the court against the prisoner.
Without considering various other errors which are urged in argument as existing in his Honor’s charge, let the judgment be reversed and the cause remanded.